IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEREMY SHANE COCHRAN,

    Plaintiff,

    v.

SARAH PANARDI,[1]
MISTY GUTHRIE,
JOHN G. SINDY,[2]
LT. VAUGHN WHITEMAN,

    Defendants.

Civil Action No.:  RDB-20-3695

## MEMORANDUM OPINION

Self-represented Plaintiff Jeremy Shane Cochran, a state inmate, brought this civil action pursuant to 42 U.S.C. § 1983 against Sarah Panardi, Misty Guthrie, John G. Sindy, and Lt. Vaughn Whiteman, asserting violations of his constitutional rights arising from his removal from the Special Needs Unit ("SNU") at North Branch Correctional Institution ("NBCI"), located in Cumberland, Maryland.  ECF No. 1.  As relief, he seeks monetary damages and injunctive and declaratory relief, including his assignment to a single cell on the SNU.  ECF No. 1.[3]

On March 29, 2021, Defendants John G. Sindy, Vaughn Whiteman, Misty Guthrie, and Sarah Panardi filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment supported by numerous exhibits.  ECF No. 17.  On August 19, 2021, Cochran filed a Motion for Summary Judgment (ECF No. 21) which is in substance a response in opposition to Defendants'

---

[1] The Clerk shall correct the spelling of Defendant Panardi and Guthrie's surnames.

[2] The Clerk shall add Defendant Sindy to the docket.

[3] Subsequently Cochran sought to amend his complaint (ECF Nos. 6 and 7) to add additional Defendants who responded to the December 7, 2020 assault and to add a claim that Lt. Whiteman used a needle to cut Cochran's neck. The Motions to Amend were denied.  ECF No. 8.  Although Defendants have responded to the allegations concerning Whiteman cutting Cochran with a needle and to Cochran's effort to add supervisory defendants who responded to the assault, (ECF No. 17) those claims are not properly before the Court and will not be considered.

motion.[4]  He also filed supplemental opposition responses, which were docketed as correspondence.  ECF Nos. 23, 24 and 26.  Defendants filed a response in opposition to Cochran's Motion.  ECF No. 25. A hearing is not necessary.  *See* Local Rule 105.6 (D. Md. 2021).  For the reasons explained below, the Court will DENY Cochran's  Motion and request for injunctive relief and GRANT Defendants John G. Sindy, Vaughn Whiteman, Misty Guthrie, and Sarah Panardi's Motion, construed as a Motion for Summary Judgment.[5]  Accordingly, summary judgment is entered in favor of Defendants John G. Sindy, Vaughn Whiteman, Misty Guthrie, and Sarah Panardi and against Cochran.

## Background

### A.    Cochran's Allegations

Cochran alleges that on November 10, 2020, he wrote to Defendants and told them that he feared he would be killed in population.[6]  ECF No. 1, p. 2.  He states that he "begged them to put me back on the mental health tier where [he] was held from February 2014 until June 1, 2020." *Id.*  He states that he was removed from the SNU because of lies told by the SNU team. *Id.*

On December 7, 2020, Cochran was stabbed by members of the Bloods gang.  ECF No. 1,

---

[4] To the extent Cochran raises new claims regarding his being taken off his pain medication, denied equal protection, not provided medical care for the injuries he suffered during the assault, and being targeted by correctional staff because of his criminal offenses, those claims are not properly before the Court and will not be considered.  *Mylan Laboratories, Inc. v. Akzo, N. V.,* 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)), *aff'd,* 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs,* 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd,* 141 F.3d 1162 (4th Cir. 1998). *Woodbury v. Victory Van Lines,* 286 F.Supp.3d 685, 692 (D. Md. 2017) (stating it is axiomatic that a plaintiff may not use their memorandum in opposition to amend the complaint).

[5] Defendants' dispositive submission will be treated as a Motion for Summary Judgment under Federal Rule of Civil Procedure 56 because materials outside the original pleadings have been considered.  *See Bosiger v. U.S. Airways,* 510 F. 3d 442, 450 (4th Cir. 2007).

[6] In his Motion for Summary Judgment, Cochran asserts for the first time that in November of 2020 he "wrote numerous letters to prison officials for protection from being stabbed by inmate Rosa and Martin . . . ."  ECF No. 21, p. 1. He does not identify to whom he sent these letters.

p. 3.  Cochran states that he advised the named Defendants of the harm that awaited him.  *Id*.  He states that Lt. Whiteman told him that if he "did not drop the issue he was going to put [Cochran] in the cell with the biggest blackest greases nigger and let them kill me." (sic) *Id*.  Cochran claims that he "heard" that Defendants set up the stabbing.  *Id*.

### B.     Defendants' Response

Defendants explain that prior to June of 2020, Cochran was assigned to NBCI's SNU.  The SNU provides focused mental health care to inmates who are seriously mentally ill.  ECF No. 17-3, p. 2, ¶ 4 (Guthrie Decl.).  Defendants further explain that such seriously mentally ill inmates are typically a vulnerable population.  *Id*.  Due to safety and security concerns, inmates who are members of security threat groups are not permitted to be housed on the SNU.  *Id*.; ECF No. 17-4, p. 2, ¶ 3 (Pinardi Decl.); ECF No. 17-5, p. 2,  ¶ 3 (Sindy Decl.); ECF No. 17-6, p, 2, ¶ 3 (Whiteman Decl.).

On June 1, 2020, Cochran signed a statement affirming that he was a member of a white supremacist security threat group and had been so affiliated for 50 days.  ECF No. 17-7, p. 3.  The SNU team was advised of Cochran's admission to being a member of a security threat group and that same day determined that he should be removed from the SNU pending an investigation as to his security threat group status.  ECF No. 17-3, pp. 2-3, ¶¶ 6, 7; ECF No. 17-4, pp. 2-3, ¶¶ 4-5; ECF No. 17-5, p. 2, ¶ 4; ECF No. 17-6, p. 2, ¶ 4; ECF No. 17-8, p. 18 (Health Records).  Cochran refused to change his housing assignment and was therefore assigned to disciplinary segregation.  ECF No. 17-5, p. 3, ¶ 5, and p. 5; ECF No. 17-8, p. 18.

Later that day, Cochran wrote to the Warden claiming that he lied to staff about being a member of a security threat group to avoid being placed in a cell with a Black inmate.  ECF No. 17-7, pp. 4-8.  He nevertheless also admitted in the letter to the Warden that he was a member of

the Ku Klux Klan (KKK).  *Id.*, p. 6.

Although no longer housed on the SNU Cochran continued to receive SNU care and monitoring while his security threat group status was investigated.  ECF No. 17-8, pp. 14-44.

On June 4, 2020, Sarah Pinardi, a Clinical Professional Counselor, who is the Coordinator of the SNU program, noted that Cochran's white supremacist security threat group affiliation presented a particular concern for the wellbeing of SNU inmates, many of which were African-American.  ECF No. 17-8, p. 18; ECF No. 17-4, p. 2, ¶¶ 1, 4.  That same day, Cochran told Misty Guthrie, a Licensed Certified Social Worker assigned to the treatment team in the SNU, that he was high and drunk the day he signed the statement regarding his security threat group membership.  ECF No. 17-8, p. 19.

On June 10, 2020, the SNU team noted that Cochran's status was pending an investigation.  ECF No. 17-7, p. 9; ECF No. 17-6, p. 3, ¶ 7, and p. 5; ECF No. 17-8, p. 24.  Ultimately, NBCI's Intelligence Unit reported that Cochran's self-identified affiliation with a white supremacist security threat group put other inmates at risk.  ECF No. 17-3, p. 3, ¶ 8; ECF No. 17-5, p. 3, ¶ 6.  On June 17, 2020, Pinardi sent an email sharing the Intelligence Unit's assessment with the SNU team so that they could decide whether to discharge Cochran from the SNU.  ECF No. 17-4, p. 3, ¶ 7 and pp. 6-10; ECF No. 17-5, p. 3, ¶ 7; ECF No. 17-6, p. 3, ¶ 8, and pp. 6-10; ECF No. 17-8, p. 44.

The following day, after determining that discharging Cochran from the SNU would protect the other inmates while Cochran could continue to receive appropriate mental health care, the SNU team recommended the Warden approve Cochran's removal from the SNU.  ECF No. 17-4, p. 3, ¶ 8 and p. 11.  ECF No. 17-3, p. 3, ¶¶ 9, 10 and p. 6 (SNU Committee Action); ECF No. 17-5, p. 3, ¶ 8; ECF No. 17-8, p. 44.  In making their recommendation, the SNU team

considered not only that Cochran presented a threat to other SNU inmates because of his identification as a white supremacist but also his manipulative, demanding, and threatening behavior, which included making false claims against other inmates, all of which adversely affected the other SNU inmates.  ECF No. 17-4, p. 3, ¶ 8; ECF No. 17-3, p. 3, ¶ 10 and p. 6; ECF No. 17-8, p. 44; ECF No. 17-7, p. 10.  The team determined that Cochran could receive mental health care other than on the SNU and balancing all of the needs, his removal was appropriate.  *Id*. On June 19, 2020, the Warden approved the team's recommendation and Cochran was discharged from the SNU.  ECF No. 17-4, p. 3, ¶ 9.

Defendants explain that Cochran continues to identify and behave as a member of a white supremacist security threat group.  As an example, they explain that on April 16, 2021, he sent a death threat to Maryland Correctional Institution-Women using racial slurs and the phrase "white power."  ECF No. 17-3, ¶ 8, pp. 7-9; ECF No. 17-6, p. 4, ¶ 11 and p. 12; ECF No. 17-10, p. 3. Cochran's identification with white supremacy and threatening behavior continue to raise a concern regarding his assignment to the SNU particularly given that a majority of the SNU inmates are African-American.  ECF No. 17-4, p. 2, ¶ 4.

After his discharge from the SNU, Cochran has continued to receive regular mental health care.  ECF No. 17-3, pp. 3-4, ¶¶ 12-15; ECF No. 17-4, p. 5, ¶ 16; ECF No. 17-8, pp. 45-139 and ECF No. 17-9.  Specifically, Guthrie continued to provide individual mental health treatment sessions to Cochran, just as he received from her while he was assigned to the SNU.[7]  ECF No. 17-3, pp. 3-4, ¶ 12; ECF No. 17-8, pp. 19-20, 29-30, 42-43, 47-48, 62-67, 138-39; ECF No. 17-9, pp. 30-31, 41-44, 97-98, 104-05.  Additionally, Guthrie offered to meet with Cochran on February

---

[7] Cochran disputes receiving ongoing mental health treatment from Guthrie since filing this Complaint.  He states that "she meets [him and] asks [him] how [his] mother and kids are and when [he goes] to court on [his] criminal case."  ECF No. 21, p. 2.

26, 2021 but he declined.  ECF No. 17-3, p. 4, ¶ 12. ECF No. 17-8, p. 115.  Because of the COVID-19 state of emergency, the SNU inmates were seen on an emergency basis.  ECF No. 17-3, p. 4, ¶ 12.  Nevertheless Cochran received a number of non-emergency mental health sessions even though he was not designated as an SNU inmate.  *Id*.

After his discharge from SNU, Cochran also continued to receive mental health services from Dr. Siracusano.  ECF No. 17-3, p. 4, ¶ 13; ECF No. 17-8, pp. 31-41, 49-57, 74-85, 101-12; ECF No. 17-9, pp. 1-12, 45-56, 62-71, 81-92, and 109-120.  Additionally, since December 2020, Cochran received mental health monitoring from other trained mental health care providers 3-5 times a month during segregation rounds.  ECF No. 17-3, p. 4, ¶ 13; ECF No. 17-8, pp. 14-17, 21-23, 26-28, 86-100, 113-14, 119-21, 123-372; ECF No. 17-9, 17- 29, 32-40, 57-61, 72-80, 93-94, 99-103, 106-08, 121-29, 132-34.  Those making segregation rounds advised Cochran's regular mental health providers if he had any special concerns that required attention.  ECF No. 17-3, p. 4, ¶ 14.

Defendants report that Cochran continues to receive appropriate mental health care although he is not assigned to the SNU.  ECF No. 17-4, p. 5, ¶16; ECF No. 17-3, pp. 3-4, ¶¶12-15; ECF No. 17- 8, pp. 45-73.  On August 6, 2021, Cochran reported to Guthrie that he felt safe in his housing assignment on HU 3 general population.  ECF No. 17-3, p. 5, ¶ 19.

In regard to Cochran's reported fears, Defendants explain that Cochran has a history of making up stories in order to be assigned to a single cell and that it is difficult to know when he is telling the truth.  ECF No. 17-6, pp. 3-4, ¶ 9; ECF No. 17-5, p. 4, ¶ 9; ECF No. 17-9, p. 139.  As examples of Cochran's conduct, Defendants explain that on May 26, 2020, he told Nurse Monica that he wanted a single cell because he was concerned he would harm or kill any cellmate.  ECF No. 17-8, p. 3.  On May 27, 2020, he reported he needed a single cell due to his mental illness and

6

that if his request was denied he would sue. *Id.*, p. 10.  On July 24, 2020, Cochran sent an Inmate Request to Pinardi stating that the Warden recommended he be returned to the SNU.  ECF No. 17-4, pp. 3-4, ¶ 10 and pp. 12-15.  On the same day he made a similar statement to a social worker. *Id.*  However, no such recommendation had been made by the Warden, instead the Warden had requested the SNU team's opinion as to whether Cochran should be returned to the SNU based on Cochran's representations that he was not a member of a security threat group.  *Id.*

On August 1, 2020, Cochran wrote the Warden stating that his June claim regarding his security threat group affiliation occurred because he was high and drunk.  ECF No. 17-5, p. 4, ¶ 9 and pp. 6-8.  He also demanded a single cell and made claims about correctional staff.  *Id.*

On August 8, 2020, Cochran reported that his cellmate Kevin Waters sexually harassed him.  ECF No. 17-11, p. 4 (IID report).  Waters and Cochran were separated while the matter was investigated.  On August 12, 2020, after the investigation was concluded, Cochran was advised that the investigator determined his complaints about Waters were unfounded.  *Id.*, p. 16.  In making such a determination, the IID investigator found Cochran's statements inconsistent and noted that it appeared Cochran made the report in an effort to be obtain a single cell.  *Id.*  That same day, Cochran wrote to the Warden threatening to file a lawsuit if he was not given a single cell.  ECF No. 17-11, pp. 10-11.

On August 14, 2020, Sgt. Lewis, Guthrie, and a case manager met with Cochran.  ECF No. 17-12, p. 2, ¶ 3 (Lewis Decl.); ECF No. 17-8, p. 47.  Cochran stated that he did not want another cellmate.  He also claimed that he needed a single cell because he received "kites" that someone he had made a Prison Rape Elimination Act (PREA) report on was going to put a hit on him.  *Id.*  When asked for the kites, Cochran stated that he did not have them.  ECF No. 17-12, p. 2, ¶ 3.  Cochran was also asked for the source of his information but could not provide any names.  *Id.*

Lewis offered to move Cochran to a different location but advised that he would not have a single cell.  *Id.*  Lewis also offered Cochran the opportunity to ask for a specific cellmate.  *Id.*, ¶ 4. Cochran identified inmate Keihl, who agreed to the assignment, and the two inmates became cellmates on September 16, 2020.  *Id.*  Cochran stated that without a single cell assignment he would stay where he was then assigned.  *Id.*  In the end, he indicated he did not have a concern for his safety and only wanted to move if it was to a single cell.  *Id.*

On August 17, 2020, the Warden received a letter from Cochran stating that he wanted a single cell because he was concerned about a sexual assault, but did not request a return to the SNU.  ECF No. 17-8, p. 6; ECF No. 17-4, p. 17.  He threatened that if he was not provided a single cell he would commit self-harm.  *Id.*  That same day Cochran's letter was referred to Pinardi, who responded to Cochran's threats and advised the Warden that inmates who threatened self-harm were safer when double celled.  ECF No. 17-4, p. 4, ¶ 11 and p. 16.

On two occasions in September 2020, Cochran reported to Guthrie that he was doing well on his tier and that he had no major issues.  ECF No. 17-8, pp. 62, 64.

On November 12, 2020, the Psychology Department received a letter dated November 8, 2020 from Cochran to Pinardi.  ECF No. 17-4, p. 4, ¶ 12 and pp. 18-20.  Cochran demanded to be placed in a single cell on the SNU and reported that inmates came into his cell and stole his appliances and other personal property and reported having to pay "rent" to other inmates to live on the tier.[8]  ECF No. 17-4 pp. 18-20.  Pinardi met with Cochran the day she received his letter to discuss his concerns.  ECF No. 17-4, p. 4, ¶ 12 and pp. 20-21.  Because Pinardi did not have

---

[8] Cochran contends that during this meeting he advised Defendants that inmates Michael Martin and his cell buddy known as "Fats" told Cochran that due to the nature of his convictions he needed to pay $1,000 weekly to stay on the tier, otherwise if he did not pay they would steal his appliances or harm him.  ECF No. 28, p. 2.  Whiteman then had Martin and Fats' cell searched and the inmates knew that the search occurred because of Cochran's complaints and thus he was labeled a snitch on the tier and placed at risk of harm.  *Id.*

authority over security decisions regarding Cochran's housing assignment, she had a case manager, who could arrange alternative housing, attend the meeting. *Id*., ¶ 13. During the meeting, it appeared to Pinardi that Cochran's claims regarding the recent theft of his personal property were not true. *Id*. and ECF No. 17-4, p. 21. During the discussion, Cochran advised Pinardi that he did not fear for his safety. *Id*. Pinardi read to Cochran the portion of his letter where he stated he was afraid and he replied that if he were placed on the SNU in a single cell he would feel safe. ECF No. 17-4, p. 4, ¶ 13 and p. 21. The case manager advised Cochran that if he feared for his safety he could be placed on administrative segregation while the matter was investigated but Cochran did not want to be placed on administrative segregation. ECF No. 17-4, p. 5, ¶ 13, and p. 21. Cochran stated that he was not afraid for his safety and asked to be returned to his cell. ECF No. 17-4, p. 5, ¶ 13 and p. 21.

Pinardi opines, based on her training and experience, including providing treatment to Cochran, that when Cochran wrote the November 12th letter he did not fear for his safety but rather was trying to get an assignment to a single cell. ECF No. 17-4, p. 5, ¶ 15. She further opines that Cochran would have accepted any single cell, not just a single cell on the SNU, because he did not complain about missing out on any of the care provided on the SNU.[9] *Id*. When offered a move from his housing unit that did not guarantee a move to a single cell, he declined to be moved. *Id*.

In November of 2020, Cochran did not communicate to any of the other named Defendants any particular concern regarding his safety. ECF No. 17-3, p. 4, ¶¶16, 17; ECF No 17-5, p. 4, ¶ 10; ECF No. 17-6, p. 4, ¶ 12.

On December 7, 2020, at approximately 12:15 p.m. cell doors opened on Cochran's tier to

---

[9] Cochran states that he does "not want back on the SNU tier or program . . . .[he is] just fine being in my single cell in H.U. 3 but still fear[s] for [his] life and safety a little but ha[s] not had much trouble over here." ECF No. 23, p. 5.

release inmates from their cells to go to the yard.  ECF No. 17-11, p. 27; EF No. 17-7 (Video filed separately).  As other inmates stepped out of their cells into the hall, inmates Rosa-Grullon and Michael Martin, left their cells, joined up and ran into Cochran's cell where they attacked Cochran.  ECF No. 17-11, pp. 27-28; ECF No. 17-7 (Video at 12:15-58-12:16-07).  In less than 30 seconds, correctional staff had pulled the inmates out of Cochran's cell.  ECF No. 17-11, pp. 27-28; ECF No. 17-7 (Video at 12:15-58-12:16-07).

### Standards of Review

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim.  However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger*, 510 F.3d at 450.  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is

pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Hous., LLC v. The City of Salisbury, Maryland*, 672 F. App'x. 220, 222 (4th Cir. 2016) (per curiam).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original).  The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015).

Because he is proceeding pro se, Cochran's submissions are liberally construed.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Nonetheless, this Court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding

to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted.)

### Discussion

Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(6) or summary judgment under Rule 56. They argue that (1) the Eleventh Amendment bars suit against them in their official capacity; (2) Cochran fails to state an Eighth Amendment claim that Defendants failed to protect him from harm; (3) Cochran's removal from the SNU did not violate his constitutional rights; (4) Defendants are entitled to qualified immunity; and (6) Cochran is not entitled to injunctive relief.

### I.     Official Capacity

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from citizen suits in federal court absent state consent or Congressional action. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). The State of Maryland has not waived such immunity for claims brought pursuant to § 1983. Accordingly, Defendants are immune from suit for actions taken in their official capacity.

### II.     Failure to Protect

Cochran's claim that the named Defendants failed to protect him from harm because he was attacked by other inmates on his tier after he was removed from the SNU is unavailing. "The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer v. Brennan*,

511 U.S. 825, 832 (1994)). Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'" *Id.* "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014). The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id.* at 837. A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence' so that "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128.

Actual knowledge of a substantial risk does not alone impose liability. Where prison

13

officials responded reasonably to a risk, they may be found free of liability.  *Farmer*, 511 U.S. at 844.  Here, Cochran notified staff that he was afraid of other inmates on his tier.  Staff investigated Cochran's claims and found them unpersuasive in light of his repeated efforts to obtain single cell housing and his regular retraction of claims regarding his safety.  Further, despite his claimed fear, he repeatedly refused to cooperate when he was offered a different cell assignment.  Despite there being no evidence before the Court that Cochran faced a substantial risk of serious harm, Cochran was permitted to choose his own cellmate and on a number of occasions offered a cell change, which he refused because the offers did not guarantee a placement in a single cell.  While Cochran did ultimately select his cellmate, as late as one month prior to the December assault he declined to be placed on administrative segregation and advised staff that he felt safe where he was housed.  Rather than Defendants acting with indifference to Cochran's claims, Defendants responded, investigated, and acted to protect him by offering him both the choice of his cellmate and a cell change.  There is simply no evidence that Defendants acted in anything but good faith to maintain order and security and to find the most suitable housing for Cochran while balancing his needs and the needs of other inmates.  That Cochran was attacked in his cell is unfortunate, and there is no doubt that he suffered serious injuries, nevertheless there is no evidence that Defendants acted with the requisite indifference to his safety.  They are therefore entitled to summary judgment.

## III.    Assignment to the SNU

Cochran complains about both his removal from the SNU and the failure of Defendants to reassign him to the SNU.  To the extent Cochran complains that he has been deprived of due process due to his failure to be retained on the SNU, his claim is unavailing.  Likewise, there is no evidence that Cochran's Eighth Amendment right to adequate mental health care was violated by his removal from the SNU.

A.  Fourteenth Amendment

The Fourteenth Amendment's Due Process Clause guarantees that no state shall "deprive any person of ... liberty ... without due process of law."  To bring a due process claim, a plaintiff must first show the existence of a protected property or liberty interest.  *Mathews v Eldridge*, 424 U.S. 319, 332 (1976); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  A plaintiff may bring a civil action to redress due process violations under 42 U.S.C. § 1983.  In the prison context there are two different types of constitutionally protected liberty interests that may be created by government action.  The first is created when there is a state created entitlement to an early release from incarceration.  *Board of Pardons v. Allen*, 482 U.S. 369, 381 (1987) (state created liberty interest in parole); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (state created liberty interest in good conduct credits).  The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see Wilkinson v. Austin*, 545 U.S. 209 (2005).  As the Fourth Circuit noted, "[t]he Supreme Court has long recognized that a prisoner may have a state-created liberty interest in certain prison confinement conditions…."  *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).  Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily . . . fact specific" comparative exercise.  *Beverati v. Smith*, 120 F.3d 500, 502-3 (4th Cir. 1997); *accord Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . requires case by case, fact by fact consideration.") (alteration in original) (internal quotation marks omitted).

The Fourth Circuit has explained: "*Wilkinson* does not hold that harsh or atypical prison

conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection." *Prieto*, 780 F.3d at 250. Rather, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations combined with . . . harsh and atypical conditions" for Due Process protections to apply. *Id.* (emphasis in original) (citing *Wilkinson*, 545 U.S. at 224-25). As a prisoner, Cochran is not entitled to the process due to persons who remain at liberty. "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225.

Cochran seemingly contends that the failure to house him within the SNU violates his right to due process. But there is no constitutional right for an inmate prisoner to be housed in a particular institution, at a particular custody level, or in a particular portion or unit of a correctional institution, nor does a prisoner have a right to participate in a particular program. *See Sandin*, 515 U.S. at 484 (concluding that protected liberty interests are generally limited to freedom from restraint which imposes atypical and significant hardship on inmate in relation to ordinary incidents of prison life); *McKune v. Lile*, 536 U.S. 24, 26 (2002) (stating the "decision where to house inmates is at the core of prison administrators' expertise"); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) (holding that the Constitution's Due Process Clause does not "protect a duly convicted prisoner against transfer from one institution to another within the state prison system"); *see also Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983); *Rizzo v. Dawson*, 778 F. 2d 527, 530 (9th Cir. 1985).

Matters of security classification are reserved to the sole discretion of prison officials. *See Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir. 1994). In analyzing conditions of confinement, the

court must consider a correctional system's need to maintain order, discipline, and control.  *See Sandin*, 515 U.S. at 483-84 (stating that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment"); *see also Wolff*, 418 U.S. at 558–62.  In sum, this Court is unaware of any Maryland law or regulation conferring a protected liberty interest on DOC inmates that has been abridged here.  Absent a protected liberty interest, a Plaintiff cannot successfully claim that his due process rights were violated, because "[p]rocess is not an end in itself."  *Olim*, 461 U.S. at 250.

Cochran had no liberty interest in being assigned to or remaining in the SNU once assigned. His removal from the SNU to the general population, deemed necessary for the security and safety of other inmates assigned to the SNU, coupled with, as discussed below, his continued receipt of mental health services, did not violate Cochran's rights.  Further, contrary to Cochran's apparent belief, he was not removed from the SNU solely based on his self-identifying as a member of a security threat group, but also because of his disruptive behavior including making false claims against staff and other inmates.  Reviewing Cochran's allegations in the light most favorable to him, there are no genuine issues of disputed material fact and Defendants are entitled to summary judgment in their favor as a matter of law.

B.  Eighth Amendment

To the extent Cochran claims that his removal from SNU violated his rights to appropriate psychiatric care, his claim is also unavailing.  The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by

17

statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).   To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer*, 511 U.S. at 834-7 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).   Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).   "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"   *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto,* 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839-40.   Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that

his[/her] actions were inappropriate in light of that risk.'"  *Anderson*, 877 F.3d at 545 (quoting

*Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129

F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the

general risk, and also that the conduct is inappropriate in light of that risk.").  "Actual knowledge

or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate

indifference 'because prison officials who lacked knowledge of a risk cannot be said to have

inflicted punishment.'"  *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting

*Farmer*, 511 U.S. at 844).  The subjective knowledge requirement can be met through direct

evidence of actual knowledge or through circumstantial evidence tending to establish such

knowledge, including evidence "that a prison official knew of a substantial risk from the very fact

that the risk was obvious."  *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

There is no underlying distinction between the right to medical care for physical ills and

its psychological and psychiatric counterpart.  *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977);

*see also DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) ("Courts treat an inmate's mental

health claims just as seriously as any physical health claims.").

> [A prisoner] is entitled to psychological or psychiatric treatment if a physician
> or other health care provider, exercising ordinary skill and care at the time of
> observation, concludes with reasonable medical certainty (1) that the prisoner's
> symptoms evidence a serious disease or injury; (2) that such disease or injury is
> curable or may be substantially alleviated; and (3) that the potential for harm to
> the prisoner by reason of delay or the denial of care would be substantial.

*Bowring*, 551 F.2d at 47.  The *Bowring* Court further concluded that the aforementioned right to

such treatment is based upon the essential test of medical necessity and not upon that care

considered merely desirable.  *Id*. at 48.

The record evidence demonstrates that Cochran continued to receive mental health care

both while Defendants considered his removal from the SNU and after his removal from the SNU.

19

Cochran's complaints that the mental health care provided to him off the SNU consisted merely of mental health providers checking in on him about his family is not supported by the record evidence.  Cochran's medical records reveal that he was seen regularly by mental health care providers including social workers, psychologists, and psychiatrists.  He was also seen by other medical providers who inquired of Cochran's mental health status and made appropriate referrals to mental health providers when indicated.  Additionally, Cochran was prescribed psychotropic medication to treat his mental health illness and received individual therapy and counselling.  In recognition of Cochran's serious mental health problems, Defendants took care to insure that despite his removal from SNU he continued to receive the same level of mental health care as SNU assigned inmates, no matter where he was physically housed.  His complaint about where he was entitled to receive mental health services is merely a disagreement with the care provided.  Absent extraordinary circumstances, disagreements between an inmate and a physician over the inmate's proper care are insufficient to demonstrate deliberate indifference.  *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *accord Jackson,* 775 F.3d at 178 ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference.").  There are no exceptional circumstances alleged in this case. In light of the foregoing, Defendants are entitled to summary judgment regarding Cochran's claim that he was denied adequate mental health care.

**V.    Injunctive Relief**

Cochran's request for injunctive relief is also denied.  A preliminary injunction is an extraordinary and drastic remedy.  *See Munaf v. Geren,* 553 U.S. 674, 689-90 (2008).  A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm

in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009).  As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).  In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances.  *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).  For the reasons discussed above, Cochran has failed to demonstrate the likelihood of success on the merits and for this reason alone his request for injunctive relief must be denied.  Moreover, Cochran has also failed to demonstrate that he is likely to suffer irreparable harm if he is not returned to the SNU or that the balance of equities tips in his favor.

## Conclusion

Accordingly, Cochran's pending motion IS DENIED.  Defendants' Motion, construed as a Motion for Summary Judgment IS GRANTED.[10]

A separate Order follows.


 December 1, 2021                                        /s/
          Date                                    RICHARD D. BENNETT
                                          UNITED STATES DISTRICT JUDGE

---

[10] In light of the Court's ruling, an analysis of the Defendants' remaining arguments, including their defense of qualified immunity is not necessary.